## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **DYLAN McGLOTHLIN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 7:21cv00377** |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **TRACY MATHENA,** | ) | |
| **Defendant** | ) | **By: Pamela Meade Sargent** |
| | ) | **United States Magistrate Judge** |
| | ) | |

Plaintiff, Dylan McGlothlin, ("McGlothlin"), a Virginia Department of Corrections, ("VDOC"), prisoner formerly incarcerated at River North Correctional Center, ("River North"), has filed this civil rights action pursuant to 42 U.S.C. §1983, against Tracy Mathena, ("Dr. Mathena"), alleging that his Eighth Amendment rights under the U.S. Constitution were violated. This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). This case is before the court on the parties' cross motions for summary judgment. (Docket Item Nos. 18, 25.) For the reasons stated below, I will deny both motions based on a genuine dispute of material fact.

### I. Facts

In his Complaint, (Docket Item No. 1), which was not made under oath or penalty of perjury, McGlothlin alleged that he has been an insulin dependent diabetic since November 2009. McGlothlin alleged that he was required to take an insulin dosage before each meal. He alleged that, since arriving at River North, he had been denied his insulin dosage at lunch. He stated that this denial amounted to deliberate

indifference to his serious medical condition by Dr. Mathena. McGlothlin alleged that Dr. Mathena "has repeatedly refused me and directed his staff to not accommodate my medical condition which can be detrimental to my health." (Complaint at 4.) McGlothlin alleged that Dr. Mathena's "actions are causing irreversible damage to my body and internal organs." (Complaint at 4.) McGlothlin sought money damages and injunctive relief ordering the prison to provide him with his insulin at lunch. McGlothlin attached various administrative remedies requests and responses to his Complaint.

In support of his motion for summary judgment, (Docket Item No. 25) ("McGlothlin's Motion"), McGlothlin filed a declaration under penalty of perjury which ends with the statement, "I, Dylan McGlothlin, swear all this to be true." (Docket Item No. 25-3 at 16.) In this declaration, McGlothlin stated that he is a Type 1 diabetic diagnosed in November 2009. McGlothlin stated that he had been incarcerated since December 6, 2017, and he arrived at River North on March 26, 2021. When he arrived at River North, McGlothlin stated, he was evaluated by a registered nurse. McGlothlin said that the nurse took his vital signs, and he informed the nurse that he was a Type 1 diabetic. He said the nurse placed him on a diabetic check list to get his blood sugar levels checked at 5 a.m., 3 p.m. and 8 p.m. pill passes each day.

McGlothlin said when no nurse came to check his blood sugar before the lunch meal on the next day, March 27, 2021, he pressed the emergency contact button in his cell and asked prison staff to contact medical staff to inform them that he needed his blood sugar level checked and insulin provided in order to eat. McGlothlin said he was informed that medical staff would not come to check his blood sugar. McGlothlin stated that he then requested to speak to a sergeant, and

Sgt. Burnette came and spoke to him. McGlothlin said he informed Sgt. Burnette that he was a Type 1 diabetic and that he needed insulin before he could eat. Sgt. Burnette stated that he would try to contact the Medical Department, but he doubted that anyone would come see McGlothlin before the next pill pass. Burnette instructed McGlothlin to write an Informal Complaint, which McGlothlin did. This Informal Complaint is attached to McGlothlin's Motion at Exhibit No. 1.

On this Informal Complaint, RNCC-21-INF-00456, dated March 27, 2021, McGlothlin wrote to the Medical Administrator:

> I am an Insulin Dependent Diabetic and I have NOT been receiving my Insulin Dosage/Blood Sugar check at lunch time. I am REQUIRED to have my blood sugar check for Breakfast, Lunch and Dinner. I fear if something doesn't get resolved then I will fall out into Diabetic [Ketoacidosis] (DKA). Please Help!!

(Docket Item No. 25-2 at 2.) The Informal Complaint notes that it was received and assigned to the Medical Department on March 30, 2021. On March 31, 2021, K. Wallen, R.N.C.A., responded: "At this facility our medication passes are 07:00 AM, 3:00 pm, and 8:00 pm. Diabetics are managed at this time."

McGlothlin stated that he then filed a Regular Grievance, which is attached to McGlothlin's Motion as Exhibit No. 3. This Regular Grievance, RNCC-21-REG-00066, which is dated April 6, 2021, stated:

> I am an Insulin Dependent Diabetic and cannot eat without Insulin. I am being refused my Life Saving Drug at Lunch Time, forcing me to either not eat or hinder my well being and health by eating without my medicine. … I am being denied Medical Services essential to my Chronic Illness. It is evident in my Glucose readings that I am suffering

bodily harm and long term damage from lack of adequate health care. I
sincerely and utterly fear for my well being, tranquility and my life.

(Docket Item No. 25-2 at 6.) On the section entitled "What action do you want
taken?" McGlothlin wrote:

> To be seen at a timely fashion by medical before the serving of the
> Lunch Time meal at [River North]. To be administered my Insulin
> dosage adequately and necessarily by my Glucose Reading. OR if my
> medical needs cannot be met by [River North], then I respectfully
> request my transfer to a VADOC Facility that can respectfully abide by
> DOC health procedures and my medical needs.

(Docket Item No. 25-2 at 6.)

McGlothlin stated that he received an Offender Grievance Response – Level
I from River North Warden David Anderson to his Regular Grievance on April 14,
2021, which he attached to McGlothlin's Motion as Exhibit 4, and which stated:

> In your grievance you state you are an Insulin Dependent Diabetic and
> cannot eat without Insulin; however, you are being refused your Life
> Saving Drug at Lunch time which is forcing you to either not eat or
> hinder your well-being and health by eating without your medicine. …
> [Y]ou are being denied Medical Services essential to your Chronic
> Illness. You contend it is evident in your Glucose readings that you are
> suffering bodily harm and long-term damage from lack of adequate
> health care. …
>
> As a result of this grievance you would like to be seen at a timely
> fashion by Medical before the serving of the Lunch time meal, to be
> administered your Insulin dosage adequately and necessarily by your
> glucose reading, or be transferred if [River North] cannot meet your
> medical needs.

-4-

> An investigation into your complaint indicates: After conferring with [River North] Medical Director Jones confirmation is established that [River North] Medical Staff are meeting your medical needs. [River North] Medical Staff manage Diabetics during medication passes, pill call, which occur at 7:00 a.m., 3:00 pm, and 8:00 pm. You do not have a special Doctor's Order written that directs Medical Staff to complete a sugar check before you eat lunch. [River North] Medical Staff have met your medical needs concerning your diabetic treatment.
> …
> After thoroughly reviewing the information presented by staff in response to your complaint and the policy governing the issue, I find your grievance to be UNFOUNDED.

(Docket Item No. 25-2 at 9.)

McGlothlin appealed the Warden's decision to the Health Services Department/Health Services Quality Improvement Unit of the VDOC. His appeal form, which is dated April 15, 2021, is attached to McGlothlin's Motion as Exhibit 5 and states:

> It is evident my needs are not being accommodated as Medical cannot deny: 1) I am an Insulin Dependent Diabetic and 2) I am not getting my Insulin before the Lunch Time meal. … I am clearly being violated in this procedure as they cannot offer a scintilla of evidence in which I have even been evaluated by the Doctor and not from lack on my behalf. With the above sworn, I hope to find a reversal of the decision by the echelon of the Health Services Director. Note, I've been at [River North] for 20 days and haven't been seen.

(Docket Item No. 25-2 at 11.)

McGlothlin stated that he received a letter dated April 16, 2021, from someone[1] in the VDOC Health Services Quality Improvement Unit, which is attached as Exhibit 6 to McGlothlin's Motion, and which stated:

> Health Services received an inquiry from a family member/friend/citizen regarding your medical care on 4/5/21. We are not permitted to give them any information concerning your medical con-dition/treatment. Therefore, we must communicate directly with you. The inquiry indicated that you are not receiving your insulin shot.
>
> Based on your information provided and upon further communication with your institution's medical department it was reported per Medical, you are receiving onsite diabetic treatment which included an evaluation by the onsite provider on 4/1/21. Your treatment plan also involved adjusting your insulin schedule to properly manage your blood sugar, providing you a bedtime snack, and monitoring your blood sugar levels.

(Docket Item No. 25-2 at 13.)

McGlothlin stated that he was evaluated by medical personnel, Joseph Chance Wright, P.A.-C., ("Wright"), on April 19, 2021. McGlothlin said that he informed Wright that he was an insulin dependent diabetic, "meaning I cannot eat without receiving my Insulin and that doing so without my Insulin could be deadly and or damaging to my body and internal organs." (Docket Item No. 25-3 at 7.)  McGlothlin said that he told Wright that he needed the checks of his blood sugar levels rescheduled to 5 a.m., 11 a.m. to 12 p.m. and 3 p.m., "aligning with the Breakfast, Lunch and Dinner meals." (Docket Item No. 25-3 at 7.)  According to McGlothlin, Wright told him that he would inform Dr. Mathena to adjust his insulin schedule.

---

[1] The signature is not legible to the court.

McGlothlin said he submitted an Emergency Grievance form on April 20, 2021, because his blood sugar level was 415, and he was feeling ill and fatigued due to his extremely high blood sugar. He attached this Emergency Grievance form, Log No. 161453, to McGlothlin's Motion at Exhibit 7. On this Emergency Grievance form McGlothlin wrote:

> My Blood Sugar was 415 which is clearly dangerously high. I need my urine checked as I am more than likely urinating keytones which is the first sign of kidney failure and Diabetic ketoacidosis. I am suffering serious internal damage from High Blood Sugar.

(Docket Item No. 25-2 at 15.) L. Sexton, L.P.N., responded that McGlothlin's Grievance did not meet the definition for an emergency and instructed him to submit a Sick Call Request to be evaluated by "nurse/sick/MD call." (Docket Item No. 25-2 at 15.)

McGlothlin said that he submitted an Offender Request form on April 21, 2021, requesting that his A1c level be checked and a urine sample taken to see if his kidneys were functioning properly due to his erratic blood sugar levels. He submitted another Offender Request form on the same date, requesting to speak to a doctor about his insulin dosages. He attached these forms to McGlothlin's Motion as Exhibit 8. (Docket Item No. 25-2 at 17-18.) Someone[2] in the Medical Department responded to both forms, stating that McGlothlin has been placed on "sick call." (Docket Item No. 25-2 at 17-18.)

McGlothin stated that he was evaluated by Dr. Mathena on April 26, 2021. McGlothlin stated that, during this evaluation:

---

[2] Again, this signature is not legible.

> I elaborated on the bodily harm being caused to me due to not receiving my Insulin at Lunch time. I told him I was an Insulin Dependent Diabetic and that I need Insulin before every meal. I explained to him that if he would adjust my Insulin schedule to fit my needs, then my Blood Sugars would seem less erratic and my A1C would continue to lower towards normal levels. I informed him that if he didn't accommodate my medical needs, then sooner or later I could suffer from bodily harm and or Diabetic ketoacidosis (DKA). I also informed him that he was even potentially causing me not to eat Lunch because if I ate Lunch without any Insulin dosages, it would elevate my Blood Sugar to dangerously high numbers.

(Docket Item No. 25-3 at 8-9.)

On May 25-26, 2021, McGlothlin said, Dr. Mathena wrote a new order for him to get his blood sugar checks at 8 a.m., 3 p.m. and 8 p.m. According to McGlothlin, this new order for a blood sugar check at 8 a.m. prevented him from eating breakfast in addition to not being able to eat lunch. McGlothlin said that he was evaluated by Medical again on June 4, 2021, due to his verbal complaints to medical personnel that he was not able to eat either breakfast or lunch on this new schedule. McGlothlin said that he again stated that he needed his blood sugar levels checked and his insulin administered at 5 a.m., 11 a.m. to 12 p.m. and 3 p.m. He was told that they would reinstate his previous schedule of blood sugar checks at 5 a.m., 3 p.m. and 8 p.m. McGlothlin said that he, again, informed Medical that this schedule was inadequate to his needs and was causing him bodily harm by keeping his blood sugar levels unstable and resulting in erratically high levels.

McGlothlin stated that on June 28, 2021, Nurse Sellers gave him an incorrect dosage of Lantus, a long-acting form of insulin. McGlothlin said that he was called

down to Medical after Nurse Sellers realized her error, told of the error and told that Dr. Mathena had ordered for him to stay in the Medical Unit overnight for observation. McGlothlin refused to stay overnight. Nurse Sexton checked McGlothlin's blood sugar levels overnight. At 8 p.m., McGlothlin's blood sugar level was 124. It was 170 at 10 p.m., and it was 345 at midnight. (Exhibit 9, Docket Item No. 25-2 at 20.) McGlothlin said that he refused a blood sugar check at 2 a.m. because his level was 345 two hours earlier. At 4:30 a.m., McGlothlin's blood sugar level was 265, and he requested his morning dose of 30 units of Lantus. Nurse Sexton refused, stating that Dr. Mathena had ordered to hold McGlothlin's morning dose due to the dosing error the previous night. Nurse Sexton contacted a medical doctor, and McGlothlin was then given 15 units of Lantus. (Exhibit 9, Docket Item No. 25-2 at 23.)   Nurse Sexton told McGlothlin he would see Dr. Mathena later that day.

McGlothlin said that he met with Dr. Mathena on June 29, 2021, and, again, brought up his need to receive his blood sugar checks at 5 a.m., 11 a.m. to 12 p.m. and 3 p.m. According to McGlothlin, Dr. Mathena told him, "I know you need your Diabetic checks at Lunch time. I've been trying to wait for you to see an Endocrinologist first before I adjust your schedule." (Docket Item No. 25-3 at 15.) McGlothlin replied, "You know exactly what an Endocrinologist is going to say. They'll more than likely think you're crazy for not already granting my need and tell you how dangerous and catastrophic it is to my health." (Docket Item No. 25-3 at 15-16.) According to McGlothlin, Dr. Mathena replied, "You're right. I will move your Diabetic checks to 5 AM, 10:30 AM and 3 PM." (Docket Item No. 25-3 at 16.) McGlothlin stated that Dr. Mathena then ordered the change in the schedule for his blood sugar checks that he was requesting through injunctive relief. The medical record in which Dr. Mathena ordered this change was attached as part of Exhibit 9 to McGlothlin's Motion. (Docket Item No. 25-2 at 23.)

McGlothlin also provided a declaration from Nicco-Kawon Pledger as Exhibit B to McGlothlin's Motion. (Docket Item No. 25-3 at 18-19.) Pledger stated that, since March 27, 2021, he had observed McGlothlin become ill and complain to correctional officers and nurses that he needed his insulin. Pledger said that, when he and McGlothlin were cellmates, he observed McGlothlin become ill almost every day, and McGlothlin's requests to receive his insulin were either ignored or denied. Pledger stated that, once McGlothlin started receiving his insulin, he no longer became ill every day.

McGlothlin also provided a declaration from Michael Butler as Exhibit C to McGlothlin's Motion. (Docket Item No. 25-3 at 21-22.) Butler stated that he was housed in a cell next to McGlothlin's cell, and he observed McGlothlin every day at lunch "go back and forth with security and medical staff just to get his blood checked." (Docket Item No. 25-3 at 22.) Butler stated that he "could tell [McGlothlin] was out of it and not feeling well." (Docket Item No. 25-3 at 22.) He also said that since McGlothlin began going to Medical every day before lunch, there was a "notic[e]able difference, and he seems to be doing all around better." (Docket Item No. 25-3 at 22.)

McGlothlin also provided a declaration from Julian Rios as Exhibit D to McGlothlin's Motion. (Docket Item No. 25-3 at 24-25.) Rios stated that he was in an adjoining cell to McGlothlin, and he could hear McGlothlin arguing with prison security and medical staff every day around lunch about getting his blood sugar checked. He said that McGlothlin looked sick a lot, and he spent a lot of time lying down and was "kind of out of it." (Docket Item No. 25-3 at 25.) He said that McGlothlin's health had improved since he had been going to Medical every day before lunch.

In support of his motion for summary judgment, (Docket Item No. 18) (Dr. Mathena's Motion), Dr. Mathena submitted a declaration as Exhibit A. (Docket Item No. 19-1 at 2-12.) Dr. Mathena stated that he was a physician licensed to practice medicine in Virginia at all times relevant to this lawsuit. Dr. Mathena received his medical degree from Eastern Virginia Medical School in 2003, and a copy of his curriculum vitae showing his medical training and experience was attached to Dr. Mathena's Motion as Exhibit 1. (Docket Item No. 19-1 at 14-15.) Dr. Mathena stated that he had been employed as a physician at River North since December 2018. In this capacity, he stated, he provided medical care to diabetic inmates while following the security measures in place at River North. Dr. Mathena stated that he had more than five years of experience as a medical provider in the field of corrections and more than 17 years of experience as a physician providing medical and emergency services in inpatient, outpatient, emergency medicine and corrections facilities.

Dr. Mathena stated that McGlothlin, who is a Type 1 diabetic and insulin dependent, was transferred to River North on March 26, 2021. Upon McGlothlin's initial intake assessment and intra-system transfer medical review on March 26, 2021, Dr. Mathena said, River North medical staff entered a standing therapeutic diet order for a healthy snack bag to aid with McGlothlin's blood sugar management and provided "Diabetic/Carbohydrate Controlled Education."

Dr. Mathena agreed that McGlothlin filed administrative remedy requests, as set out in his declaration and above, but Dr. Mathena claims that he was never aware of these requests until September 2021 when he received a copy of the Complaint in this case.

Dr. Mathena admits that McGlothlin complained of low blood sugar at 3 a.m. on March 28, 2021. Medical staff responded and checked McGlothlin's blood sugar level, which was 80, and gave him a glucose tablet. The medical record of this encounter is Exhibit 5 to Dr. Mathena's Motion. (Docket Item No. 19-1 at 23.) Nurse Sexton noted that McGlothlin was alert and oriented, and he was standing at his cell door with no symptoms of hypoglycemia. A check of McGlothlin's blood sugar level at 4:40 a.m. showed it was 118, and McGlothlin refused any insulin. McGlothlin, again, complained of low blood sugar at 1 a.m. on March 31, 2021. Medical staff checked his blood sugar level, which was 39, and gave him glucose tablets. McGlothlin was alert and oriented with no complaint of pain or discomfort other than feeling fatigued and weak. The medical record of this encounter is Exhibit 6 to Dr. Mathena's Motion. (Docket Item No. 19-1 at 25.)

Dr. Mathena stated that McGlothlin saw a medical staff member on April 19, 2021, and complained that he was not receiving insulin prior to lunch, which he claims caused elevated blood glucose levels following typically carbohydrate-heavy lunches.  The medical record of this encounter is Exhibit 10 to Dr. Mathena's Motion. (Docket Item No. 19-1 at 33.) This record stated that McGlothlin's medication compliance was poor, in that he often refused his morning doses of insulin.

Dr. Mathena stated that he saw McGlothlin for a chronic care appointment on April 26, 2021. McGlothlin requested a check of his blood glucose level every day before lunch, and Dr. Mathena said he counseled McGlothlin about the need to take insulin daily at 5 a.m. "as McGlothlin's compliance with the insulin dose was erratic." (Docket Item No. 19-1 at 7.) According to Dr. Mathena, this was the first time he was made aware that McGlothlin was requesting to have his blood glucose

level checked and to receive insulin before lunch. Following this appointment, Dr. Mathena said, he submitted a request for McGlothlin to see an endocrinologist to assist with management of his Type 1 diabetes due to his blood glucose levels being "very [erratic] with multiple low [blood glucose levels] over the last month requiring intervention." This QMC Consultation Request is attached to Dr. Mathena's Motion as Exhibit 15. (Docket Item No. 19-1 at 44.)

On May 18, 2021, at approximately 1:25 a.m., medical staff saw McGlothlin for complaints of low blood sugar. Medical staff checked his blood glucose level and gave him two glucose tablets and a Boost to drink and noted they would recheck his level at 5 a.m. During sick call on May 21, 2021, McGlothlin requested an A1c test, and he requested to have his blood glucose level checked before lunch and that he receive any necessary insulin at breakfast, lunch and dinner rather than at 5 a.m., 3 p.m. and 8 p.m. as then scheduled.

Dr. Mathena said that, on May 25, 2021, he approved a change in McGlothlin's insulin regimen, ordering that he receive three units of insulin three times a day, in addition to any medically necessary insulin, based on a sliding scale value associated with McGlothlin's blood glucose level. On June 4, 2021, during an appointment with medical staff, McGlothlin requested that his midday insulin dose be moved to 12 p.m. in an attempt to stabilize his blood glucose level.  On June 8, 2021, McGlothlin had blood drawn for a Hemoglobin A1c test. On June 9, 2021, Dr. Mathena received the lab results showing that McGlothlin's A1c score was 9.1, and he informed McGlothlin of the results and that an appointment was being scheduled with an endocrinologist.

Dr. Mathena said that, when he learned on or around June 21, 2021, that McGlothlin had not yet had his endocrinology appointment, he instructed the medical staff to submit another request form on an "Urgent (8-30 days)" basis due to McGlothlin's high A1c score. A copy of this request form was attached to Dr. Mathena's Motion at Exhibit 22. (Docket Item No. 19-1 at 58.)

On June 28, 2021, at approximately 5:10 p.m. medical staff tested McGlothlin's blood glucose level and found it to be low. Dr. Mathena instructed medical staff to house McGlothlin overnight in the medical building for observation and to check his blood glucose level every hour. McGlothlin refused to spend the night in the Medical Unit, but medical staff continued to check his blood glucose levels overnight. At approximately 2 a.m. on June 29, 2021, McGlothlin refused to have his blood glucose level checked. Dr. Mathena saw McGlothlin later that same day for follow up. During this appointment, Dr. Mathena changed McGlothlin's sliding scale insulin administration schedule and ordered that McGlothlin receive, based upon the results of the his blood glucose test, any necessary sliding scale amount of insulin at 5 a.m., 10:30 a.m. and 3:30 p.m.. That same day, Dr. Mathena also ordered McGlothlin receive three units of insulin given three times a day at 5 a.m., 10:30 a.m. and 3:30 p.m. These new orders were implemented that same day. Dr. Mathena said that he saw McGlothlin again on August 2, 2021, and McGlothlin declined any changes in his insulin dosing. Dr. Mathena also requested that the medical staff follow up on McGlothlin's endocrinology consult.

Dr. Mathena also ordered that McGlothlin's A1c level be tested again the first week of September. That test was performed on or about September 3, 2021. On September 7, 2021, Dr. Mathena reviewed the results showing that McGlothlin's A1c level had decreased to 8.7.

Dr. Mathena stated that it was his practice "to evaluate medical requests [by inmates] and then determine which ones are medically appropriate based on [his] training and experience." (Docket Item No. 19-1 at 10.) "After considering McGlothlin's time change request and reviewing his chart, I determined that McGlothlin's request to modify his blood glucose test and insulin administration regimen was medically reasonable. However, the implementation of this change required time to coordinate the safety of both inmates and medical personnel during these test times which were outside the established procedures." (Docket Item No. 19-1 at 10.)

Dr. Mathena stated that he entered an order on June 29, 2021, to change McGlothlin's midday blood glucose test and insulin administration from approximately 3 p.m. to before lunch, at approximately 10:30 a.m. A copy of this order was attached to Dr. Mathena's Motion at Exhibit 26. (Docket Item No. 19-1 at 66.) According to Dr. Mathena, starting June 29, 2021, and continuing to the present, McGlothlin's blood glucose level is checked before lunch daily, and he receives at least three units of insulin or more based on a sliding scale. Dr. Mathena stated that the decrease in McGlothlin's A1c level from 9.4 in March 2021 to 9.1 on June 9, 2021, indicated that McGlothlin's diabetes was under better control during the time period at issue. McGlothlin's further decrease in his A1c level to 8.7 in September, Dr. Mathena said, showed that McGlothlin's diabetes continued to be better managed and controlled.

According to Dr. Mathena, it is not always feasible to administer medication at a specific time in the prison setting due to non-medical-related factors such as security considerations, ongoing complications due to COVID-19 and the need to keep inmates and medical personnel safe. Dr. Mathena stated, "At no point during

my treatment of McGlothlin did I observe any signs or indications that McGlothlin's health was adversely impacted by having his blood glucose level checked and receiving insulin after lunch, rather than before. The diabetic treatment regimen he complained of in this lawsuit did not cause him any clinically significant injury." (Docket Item No. 19-1 at 11.) Dr. Mathena said that he saw "no symptoms or evidence to support McGlothlin's alleged claims that he was at risk of diabetic ketoacidosis or kidney failure." (Docket Item No. 19-1 at 11.) Dr. Mathena said that, based on his medical training and experience, McGlothlin did not experience any adverse medical consequences as a result of the timing of his blood glucose tests or insulin administration. Dr. Mathena said that all of his treatment decisions regarding McGlothlin's medical care were based on his education, training and experience as a licensed medical physician, the appropriate standard of care and applicable VDOC guidelines.

## II. Analysis

In support of his motion and in opposition to McGlothlin's Motion, Dr. Mathena argues that summary judgment should be entered in his favor because there is no genuine dispute of fact, and the undisputed facts fail to establish a constitutional violation. In particular, Dr. Mathena argues that McGlothlin's allegations amount to a disagreement as to the proper treatment of his Type I diabetes, which does not rise to the level of deliberate indifference to the serious medical need necessary to prove a violation of the Eighth Amendment. Dr. Mathena also argues that McGlothlin has failed to show that his medical care caused him any serious injury or substantial risk of injury. In support of his Motion, McGlothlin argues that he was not provided his insulin dosage before lunch from March 26 to June 29, 2021, putting his life in

danger.[3] McGlothlin concedes that he began receiving insulin prior to lunch beginning June 29, 2021.

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific

---

[3] McGlothlin's memorandum in support of his motion for summary judgment is not sworn or offered under penalty of perjury.

facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). For a prisoner to prevail on a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. In essence, treatment rendered must be so grossly incompetent, inadequate or excessive to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).

With regard to a prisoner's medical treatment, a prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious medical need. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL

495651, at *1 (W.D. Va. Feb. 21, 2008). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

Questions of medical judgment are not subject to judicial review. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment do not state cognizable constitutional claims. *See Miltier*, 896 F.2d at 851-52; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Estelle*, 429 U.S. at 105-06. An inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Jasper v. Mullins*, 2007 WL 3339605, at *2 (W.D. Va. Nov. 8, 2007) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). To establish liability under Section 1983, a plaintiff must prove that the defendant "acted personally in the deprivation of the plaintiff's rights." *Wright*, 766 F.2d at 850. Therefore, it is insufficient to show that the prison system, generically, failed to provide adequate medical care to an inmate.

In this case, McGlothlin argues that Dr. Mathena's failure, prior to June 29, 2021, to order that McGlothlin's blood glucose level be checked and insulin be administered before lunch each day amounted to deliberate indifference to McGlothlin's serious medical need as a Type 1 insulin dependent diabetic. Dr. Mathena argues that his treatment of McGlothlin's Type 1 diabetes was based on his medical judgment and posed no injury or serious risk of injury to McGlothlin.

The undisputed facts before the court show that Dr. Mathena was not aware of McGlothlin's request to have his blood glucose level checked before lunch until he saw McGlothlin for a chronic care appointment on April 26, 2021. While McGlothlin has presented undisputed evidence that he made numerous requests of the prison's medical staff for this change prior to April 26, 2021, none of these requests were responded to by Dr. Mathena, and Dr. Mathena has stated that he was unaware of any of these earlier requests until McGlothlin filed suit against him. The undisputed facts also show that Dr. Mathena did not grant McGlothlin's request at that time, but he did request that McGlothlin be seen by an endocrinologist to assist with management of his Type 1 diabetes due to his blood glucose levels being very erratic.

There is no evidence before the court that Dr. Mathena saw McGlothlin again until June 29, 2021, the date on which both parties agree that Dr. Mathena approved McGlothlin's request to have his blood glucose level checked and insulin administered prior to the lunch meal. Dr. Mathena also has provided evidence, which McGlothlin has not disputed, that he approved a change in McGlothlin's insulin regimen on May 25, 2021, ordering that McGlothlin receive three units of insulin three times a day, in addition to any medically necessary insulin, based on a sliding scale value associated with McGlothlin's blood glucose level. Dr. Mathena also ordered and reviewed an A1c test for McGlothlin in June 2021.

In his declaration, Dr. Mathena said that all of his treatment decisions regarding McGlothlin's medical care were based on his education, training and experience as a licensed medical physician, the appropriate standard of care and applicable VDOC guidelines. Dr. Mathena stated, "At no point during my treatment of McGlothlin did I observe any signs or indications that McGlothlin's health was

adversely impacted by having his blood glucose level checked and receiving insulin after lunch, rather than before. The diabetic treatment regimen he complained of in this lawsuit did not cause him any clinically significant injury." (Docket Item No. 19-1 at 11.) Dr. Mathena said that he saw "no symptoms or evidence to support McGlothlin's alleged claims that he was at risk of diabetic ketoacidosis or kidney failure." (Docket Item No. 19-1 at 11.) Dr. Mathena said that, based on his medical training and experience, McGlothlin did not experience any adverse medical consequences as a result of the timing of his blood glucose tests or insulin administration.

McGlothlin has not provided the court with any expert medical evidence to establish that he suffered from any adverse medical consequences or injury as a result of the timing of his blood glucose tests or insulin administration. McGlothlin, however, has offered evidence of statements by Dr. Mathena that, if believed by a jury, could show that Dr. Mathena knew that his refusal to alter the timing of McGlothlin's blood glucose tests and insulin administration posed a substantial risk of serious harm to McGlothlin. In particular, McGlothlin offered evidence that, at his June 29, 2021, appointment with Dr. Mathena, Dr. Mathena told him, "I know you need your Diabetic checks at Lunch time. I've been trying to wait for you to see an Endocrinologist first before I adjust your schedule." (Docket Item No. 25-3 at 15.) According to McGlothlin, he replied, "You know exactly what an Endocrinologist is going to say. They'll more than likely think you're crazy for not already granting my need and tell you how dangerous and catastrophic it is to my health." (Docket Item No. 25-3 at 15-16.) According to McGlothlin, Dr. Mathena replied, "You're right. I will move your Diabetic checks to 5 AM, 10:30 AM and 3 PM." (Docket Item No. 25-3 at 16.) A jury could find that Dr. Mathena's statement, "You're right" was an acknowledgment by Dr. Mathena that McGlothlin had a

serious medical need to have his blood glucose level checked and insulin administered before meals and that he knew that failing to do so posed a substantial risk of serious harm to McGlothlin. Thus, evidence of this statement creates a genuine issue of material fact precluding the entry of summary judgment in favor of either party.

An appropriate Order will be entered.

**ENTERED**: August 25, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE